**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **J.H.**

**No. 25-545** (Morgan County CC-33-2025-JA-1)

**MEMORANDUM DECISION**

Petitioner Mother K.F.[1] appeals the Circuit Court of Morgan County's July 24, 2025, order terminating her parental rights to J.H., arguing that the court erred in terminating her parental rights instead of imposing a less restrictive disposition.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

In January 2025, the DHS filed a petition alleging that the petitioner either abused J.H. or failed to protect the infant child from abuse after the child was diagnosed with multiple cranial hemorrhages (including chronic cerebral hemorrhages) all determined to be the result of nonaccidental trauma. According to the DHS, the parents provided unrealistic explanations for these injuries. Additionally, the DHS alleged that the child displayed injuries in November 2024 that indicated past physical abuse. The following month, after the father admitted to shaking J.H. the DHS filed an amended petition to include the information and specify that the petitioner failed to protect the child from the father's physical abuse.

At the February 2025 adjudicatory hearing, the petitioner admitted that the child's injury in November 2024 was evidence of prior nonaccidental injury that she "swept . . . under the rug" and that she took no steps to identify the perpetrator, which resulted in the child's subsequent injuries. However, when questioned about the prior physical abuse of the child, the petitioner expressed doubt that the father was the perpetrator. Accordingly, the court adjudicated the petitioner of abusing and neglecting the child. Following the hearing, the petitioner filed a motion for a post-dispositional improvement period.

The circuit court held a series of dispositional hearings over several months, with the final hearing occurring in July 2025. First, the child's maternal aunt testified to the child's injuries from

---

[1] The petitioner appears by counsel Jeremy B. Cooper. The West Virginia Department of Human Services ("DHS") appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Wyclif S. Farquharson. Counsel Page Croyder appears as the child's guardian ad litem.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

November 2024. According to the aunt, the child displayed bruising on both arms that looked like handprints from squeezing. This occurred during a family gathering after the child was with his father in another room. After the family noticed the child's injuries and suggested calling law enforcement or Child Protective Services ("CPS"), the petitioner and the father became upset and defensive and threatened that the paternal grandmother would no longer be permitted to see the child if CPS was called. This resulted in a "really big argument" among the family and the paternal grandmother kicking the parents out of her home, where they resided at the time. The aunt further explained that, although the child had a medical condition that required frequent medical appointments, the parents failed to take the child to an appointment scheduled the day after his injury in November 2024. The court also heard testimony from an expert in child abuse pediatrics who confirmed that both the November 2024 injuries and the January 2025 injuries were the result of nonaccidental trauma. The expert explained that, because he is "medically complex," the child would require long-term, extensive, consistent care from multiple specialists. A CPS worker confirmed that a different medical professional informed her that the child's various injuries were the result of nonaccidental trauma and that the parents' explanations were inconsistent with the injuries.

The petitioner testified across three hearings and explained that, following the November 2024 injuries, the paternal grandmother reported the child's injuries to CPS and the petitioner did not take the child to the hospital until directed to do so by CPS several days after the fact.[3] Despite her claims of fear that the child had been abused, the petitioner admitted that she did not attempt to determine who inflicted the child's injuries and "didn't want anybody else involved." In fact, the petitioner admitted that she withheld the visibly injured child from medical appointments to prevent authorities from investigating, even though that meant the child was not checked for more serious injuries. Critically, the petitioner testified that she tried to delay an investigation "as much as [she] could." Further, the petitioner testified that the father admitted that he shook the child and caused his January 2025 injuries prior to the parents speaking to law enforcement, yet the petitioner did not tell the police the truth because she "didn't want to believe it." Even after his admission, the petitioner at that time still did not believe that the father injured the child in November 2024. The petitioner further claimed that she had no idea the father had a history of substance abuse, despite the paternal grandmother expressing concerns about substance abuse to the petitioner and the father's latter admission that he was undergoing detoxification at the time of the January 2025 injuries. The petitioner later clarified that she lied to CPS, medical personnel, and law enforcement in order to protect the father, although she eventually separated from the father because she "was given the choice[, the father] or [her] son." Despite this, the petitioner testified at the final dispositional hearing (following the father's voluntary relinquishment of his parental rights) that she was *still* unsure if the father caused the child's November 2024 injuries, even after acknowledging that the father was the only person around the child at the relevant times. The petitioner also admitted to several issues with visitation, including that she was often late and missed at least one visit entirely. Finally, a CPS supervisor testified to concerns over the petitioner's pattern of failing to protect the child and her testimony throughout the proceedings in which she admitted to minimizing the child's abuse. The CPS supervisor explained that, although

---

[3] The November 2024 injuries occurred in Virginia and appear to have been initially investigated by Virginia CPS.

the petitioner claimed to have separated from the father, the DHS could not prevent them from reconciling and could not ensure the child's safety in the petitioner's care given her demonstrated history of failing to protect the child.

Ultimately, the court found that the petitioner ignored the risk that the father posed to the child and left the child around him despite indications of his drug abuse. The court also found that the petitioner "continue[d] to maintain that she has 'no proof' that [the father] harmed J.H. despite evidence that he did." In fact, the court found that "the only reason [the petitioner] left [the father] was because those around [her] told [her] that [she was] going to lose [her] rights if [she] didn't." In finding that there was no reasonable likelihood that the petitioner could substantially correct the conditions of abuse and neglect in the near future, the court concluded that there were no services that could remedy the petitioner's inability to recognize threats to the child's safety or properly care for herself (let alone a special needs child) in the near future. The court further highlighted the petitioner's poor decision making, as evidenced by her missing visitations or arriving late, which was "particularly problematic for caring for a child with special needs." As such, the court found that the petitioner demonstrated an inadequate capacity to solve the problems of abuse and neglect on her own or with help. The court additionally found that an improvement period would not be in the child's best interests, given his significant medical needs and care requirements. Rather, the court found that termination served the child's best interests. As such, the court terminated the petitioner's parental rights to the child.[4] It is from the dispositional order that the petitioner appeals.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's substantive rulings for abuse of discretion, factual findings for clear error, and issues of law de novo. Syl. Pt. 1, *In re K.S.*, -- W. Va. --, 930 S.E.2d 400 (2026). Before this Court, the petitioner argues that a less restrictive dispositional alternative was appropriate because she corrected the conditions of abuse and neglect by separating from the father. The record does not support this argument, however, as the petitioner was adjudicated based upon her failure to protect the child as a result of her inability to recognize threats of harm. Her separation from the father did not correct these conditions, as the court found that the petitioner continued to display poor decision making that threatened the child's safety. Moreover, the record demonstrates that the petitioner remained in a relationship with the father long after she was made aware of his abuse, testified at disposition that she was still uncertain about whether he caused all of the child's injuries, and was explicit that she left the relationship only because she was told she had to in order to regain custody of her child. This led the court to believe that she likely would have remained with the father in the face of his admitted abuse. According to West Virginia Code § 49-4-604(d), "'[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that . . . the abusing adult . . . [has] demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." We conclude that the court did not err in making this finding regarding the petitioner upon the ample evidence discussed above.[5]

---

[4] The father's rights were also terminated. The permanency plan for the child is adoption in the current placement.

[5] In support of this assignment of error, the petitioner also argues that the court erred in finding that West Virginia Code § 49-4-604(d)(5) applied to this case. According to that statute,

As we have explained, "[t]ermination of parental rights . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood . . . that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (quoting Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)). Further, termination was necessary for the child's welfare given his extensive special needs, a finding that the petitioner does not challenge on appeal. Circuit courts are permitted to terminate parental rights upon these findings. *See* W. Va. Code § 49-4-604(c)(6). While the petitioner argues that a post-dispositional improvement period was an appropriate alternative to termination, we disagree, as circuit courts are vested with discretion to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). Given the court's extensive findings concerning the petitioner's inability to correct the conditions in the near future, we conclude that the court did not err in denying the petitioner's motion for a post-dispositional improvement period.

For the foregoing reasons, the circuit court's July 24, 2025, order is hereby affirmed.

Affirmed.

**ISSUED:** July 28, 2026

**CONCURRED IN BY:**

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice H. L. Kirkpatrick
Justice James W. Flanigan

**DISQUALIFIED:**

Justice Charles S. Trump IV

---

there is no reasonable likelihood that conditions of abuse or neglect can be substantially corrected when, in relevant part, "[t]he abusing parent . . . [has] repeatedly or seriously injured the child physically or emotionally." The petitioner argues that she did not physically abuse the child and, therefore, this statute cannot be applied to her. However, it is unnecessary to address this argument because, as discussed above, the court also found that there was no reasonable likelihood the petitioner could correct the conditions based on her inadequate capacity to address them.